IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CHARLES WILSON,

        Plaintiff,

     v.

LANE COUNTY SHERRIF'S OFFICE,
JULIE A. CAMPBELL, STACEY FENLEY,
STEVE WEIR, ANN WOLLENSHLAEGER
And JOHN AND JANE DOES 1-5.

        Defendants.
_____

Case No. 6:12-cv-00691-MC

OPINION AND ORDER

MCSHANE, Judge:

At 10:29 a.m. on April 19, 2010, officers of the Lane County Sheriff's Office (LCSO) arrested Plaintiff Charles Wilson. The LCSO held Wilson in custody for approximately 31 hours, until his release at 5:15 p.m. the next day . *See* Defs' Mot. Summ. J. Ex. 26, ECF No.120. Wilson alleges the defendants deprived him of various civil rights in violation of the First, Fourth and Fourteenth Amendments of the United States Constitution. Specifically, plaintiff brings claims of: (1) unlawful arrest; (2) excessive force; (3) deliberate indifference to medical needs; and (4) lack of access to a telephone during his incarceration. Defendants move for summary judgment on all claims. Because there are genuine issues of material fact regarding the claims of

1 – OPINION AND ORDER

excessive force and lack of access to a telephone, but not regarding the claims of unlawful arrest and indifference to medical needs, defendants' motion is DENIED in part and GRANTED in part.

## BACKGROUND

This case arises out of an on-going dispute between neighbors and an arrest made by LCSO officers in the midst of that dispute. On April 18, 2010, Deputy Fenley responded to a call from Micheal Snedegar claiming that Wilson had violated a Protective Stalking Order. Defs' Mot. Summ. J. Ex. 5, at 2. At an April 5, 2010 hearing, a stalking order was granted to Snedegar providing, among other things, that Wilson "shall not obstruct, block, or alter [Snedegar]'s water access." Defs' Mot. Summ. J. Ex. 4, at 1-2. In the same hearing Wilson obtained an elder abuse restraining order against Snedegar. Tran-Caffee Dec. Ex. 3, ECF No.124-1. These two restraining orders came after years of squabbling between the two neighbors in which each repeatedly called the police on the other. *See* Tran-Caffee Dec. Ex. 1, ECF No.124-1; Wilson Dec. ¶ 1, ECF No. 126. The Snedegars' water had been turned off on multiple occasions, potentially maliciously. *See* Defs' Mot. Summ. J. Ex. 5 , at 3 ("Wilson has turned off [Snedegar's] water about 10 times in the last 5 years; mostly when he leaves town but believes Wilson also does it to be mean.").

### 1. Unlawful Arrest Claims.

When Deputy Fenley responded to the call on April 18, he confirmed the valid stalking order against Wilson with the LCSO records department and took a statement from both Snedegar and their mutual neighbor Tom Ogden. Defs' Mot. Summ. J. Ex. 5, at 2-3. He also attempted to contact Wilson both by phone and at his residence, but Wilson was unavailable. *Id.* Deputy Fenley learned that Snedegar, Wilson and their mutual neighbor Ogden all shared one

2 – OPINION AND ORDER

water line, which ran from Ogden's property to Wilson's and then on to Snedegar's. *Id*. The

water line had a cut off valve on Wilson's property, allowing him to potentially cut off

Snedegar's access. *Id*. Snedegar told Deputy Fenley that he had an easement along the water line,

but that he could not check the line for breaks because of Wilson's protective order against him.

*Id*. at 3. Ogden told Deputy Fenley that he was the caretaker of the water line and had free access

to walk along the line and check for breaks. *Id*. at 2, 4. Deputy Fenley knew that although

Snedegar had not had water pressure since the previous morning, Ogden continued to have good

pressure. *Id*.

      Deputy Fenley walked along the water line to check for breaks with Ogden. *Id*. After

finding none, Ogden showed Fenley the cut-off valves on Wilson's property, one of which was

turned off. *Id*. at 37. The cut-off valves were located on the back wall of Wilson's home,

accessible only from his back porch, which is inside a gated property that is enclosed by a

combination of fence and woods. Wilson Dec. ¶ 3. Deputy Fenley turned the valve back on and

confirmed that Snedegar's water pressure returned. Defs' Mot. Summ. J. Ex. 5, at 3. Based on

this investigation, Deputy Fenley executed an affidavit of probable cause to have Wilson arrested

for violating Snedegar's stalking order against him. *Id*. at 5.

      The next day, Wilson and Snedegar appeared in court to contest their respective

restraining orders. Defs' Mot. Summ. J. Ex. 6, at 2. Pursuant to Fenley's affidavit, LCSO

Sergeants Weir and Olson[1] went to the courthouse and arrested Wilson. *Id*. After arresting him,

Sergeant Olson asked Wilson if he had any control of the water line passing through his

---

[1] Sergeant Olson went by the last name "Wollenschlaeger" when this suit was initially filed. Apparently she has since changed her name to Olson. This opinion refers to her has Olson.

property, and Wilson replied that he changed the water line to run directly to the Snedegar's property about six months prior. *Id.*

### 2. Excessive Force Claims.

When Sergeants Weir and Olson arrested Wilson at the courthouse, Sergeant Olson placed handcuffs on Wilson and escorted him to a lower level of the courthouse. *Id.* According to Sergeant Olson's report this happened "without incident." *Id.* When deposed, Sergeant Olson recalled that Wilson was cooperative and offered no resistance, though she did not specifically recall putting handcuffs on Wilson or escorting him. Defs' Mot. Summ. J. Ex. 8, 14, 21. Sergeant Olson also recalled that Wilson did not look to be in pain when handcuffed and could not recall him saying anything when she placed handcuffs on him. Defs' Mot. Summ. J. Ex. 14.

Wilson has had a degenerative condition in his shoulder since at least 2006 which can make it spontaneously dislocate. Defs' Mot. Summ. J. Ex. 16-17. He alleges that the officers dislocated his shoulder when they pulled his arm behind his back. 3d Am. Compl. ¶ 42. Wilson's deposition testimony indicates he may have put his own hands behind his back when asked, but the police officers also used force to pull them around because he could not reach all the way. Defs' Mot. Summ. J. Ex. 13. In a prior sworn statement, Wilson said Sergeant Olson forcefully put his hands behind his back and then handcuffed him, thereby dislocating his shoulder. Wilson Aff. 2, ECF No. 13. He did not mention his shoulder condition to Sergeant Olson at the time of the arrest and may have popped his shoulder back into place before seeing the medical personnel where he was being detained. Defs' Mot. Summ. J. Ex. 13, 15.

### 3. Indifference to Medical Needs Claims.

Prison documentation indicates that when Wilson was being booked he told medical staff about several medical conditions, including his shoulder pain. Tran-Caffee Dec. Ex. 14, ECF No.

4 – OPINION AND ORDER

124-1. Wilson told medical staff he was on more than one medication and requested pain medication for his shoulder and knee pain. *Id.* Wilson's affidavit states that he told medical staff he had substantial shoulder pain and needed five different daily medications, but he never received medication. Wilson Aff. 3. After booking, Wilson collapsed while being held in custody and may have needed staff assistance to move. Tran-Caffee Dec. Ex. 7, ECF No. 124-1. He also may have needed to put his dislocated shoulder back in place, on his own, sometime during the evening. Wilson Aff. 4. Wilson's affidavit says the pain caused by his shoulder was unbearable, and he eventually made a sling for his arm. *Id.* at 5. Medical evidence confirms that Wilson has a degenerative condition in his shoulder. Defs' Mot. Summ. J. Ex. 16-17. The documentary evidence and Deputy Julie Kreiger's[2] own declaration indicate that Deputy Kreiger was the deputy on duty with Wilson for at least five hours and Wilson asked her for his medications repeatedly. Tran-Caffee Dec. Ex. 7; Defs' Mot. Summ. J., Ex. 25; Campbell Dec. ¶¶ 10, 15, ECF No. 122.

Prison medical staff examined Wilson when he was first booked, and on at least four more occasions. *See* Tran-Caffee Dec. Ex. 14; Defs' Mot. Summ. J. Ex. 25. After Wilson collapsed, medical staff evaluated him and placed him on medical observation. Tran-Caffee Dec. Ex. 7. Being placed on medical observation meant that a corrections deputy directly observed Wilson every thirty minutes to ensure that medical staff could be alerted if he began to suffer sudden or severe medical problems. Campbell Dec. ¶¶ 4-14.

Deputy Kreiger was a corrections deputy assigned to do observations of Wilson every thirty minutes. *Id.* at ¶¶ 9-11. Deputy Kreiger is not part of the prison's medical staff, cannot

---

[2] Deputy Kreiger went by the last name "Campbell" when this suit was initiated. Apparently she has since changed her name to Kreiger. She is referred to as Kreiger throughout this opinion.

prescribe medications, and has only basic medical training. *Id.* at ¶ 3. Deputy Kreiger was aware that Wilson had already been seen by nurses on multiple occasions and she did her regular observations of Wilson every thirty minutes. *See* Defs' Mot. Summ. J. Ex. 25; Campbell Dec. ¶¶ 9-13. Kreiger did not believe Wilson was suffering a medical emergency that warranted contacting medical staff, and did not even believe he had a condition to warrant him being under medical observation. *See* Tran-Caffee Dec. Ex. 7; Campbell Dec. ¶¶ 9-13.

### 4. Lack of Access to a Telephone Claims.

Wilson was housed in a day use holding cell referred to as "Bookin 2" for at least 23 minutes after he was first brought in. Defs' Mot. Summ. J. Ex. 26; Brown Dec. ¶¶ 6-7, ECF 121. Documentary evidence indicates that Wilson collapsed on the floor within thirty seconds of being brought into "Bookin 2," and it is not clear at what point he was able to recover. Tran-Caffee Dec. Ex. 7, 14. After being in "Bookin 2" Wilson was transferred to his holding cell. Defs' Mot. Summ. J. Ex. 26. Deputy Kreiger testified in her deposition that Wilson was "screaming and yelling and pounding on the door and causing quite a ruckus," which made him "unpredictable and a security concern." Defs' Mot. Summ. J. Ex. 30, 31. Wilson claims he calmly requested to use the telephone by passing notes and knocking on his door. Wilson Aff. 4. By the end of Deputy Kreiger's shift Wilson had been held incommunicado for around 10 hours.

## STANDARD

The court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.* The

6 – OPINION AND ORDER

court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)).

## DISCUSSION

### 1. John Does.

By agreement between the parties, the remaining John Does are DISMISSED from the case.

### 2. Unlawful Arrest Claims.

For an arrest to be unlawful it must lack probable cause or other justification. *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001). While Or. Rev. Stat. § 133.310(3) permits a peace officer to arrest a person who violates a stalking protective order without a warrant, such an arrest still requires probable cause. Or. Rev. Stat § 133.310(1) (2013). When dealing with a warrantless arrest, as we are here, the burden of production initially falls on the defendant to provide some evidence that the arresting officers had probable cause for the arrest. *Dubner*, 266 F.3d at 965. Here the defendants point to: (1) statements made by Snedgar; (2) the temporary stalking order against Wilson; (3) Deputy Fenley's investigation of Wilson's property with the help of Ogden; and (4) statements made by Wilson after his arrest. Def. Mem. Supp. Summ. J. 7-10, ECF 120.

Probable cause exists if, at the time of the arrest, the facts and circumstances known to the officer "were sufficient to warrant a prudent man in believing that the [defendants] had

7 – OPINION AND ORDER

committed or [were] committing an offense." *Edgerly v. City and County of San Francisco*, 599 F.3d 946, 953 (9th Cir. 2010) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). In determining whether an officer had probable cause, the Court takes into account reasonable inferences. *United States v. Struckman*, 603 F.3d 731, 739-740 (9th Cir. 2010) (citations omitted).

### a. Deputy Fenley

Deputy Fenley had probable cause to believe Wilson violated the terms of the protective stalking order. Upon receiving the call from Snedgar, Deputy Fenley corroborated the existence of the stalking order and its mandate not to obstruct Snedgar's water by checking with LCSO's records department. He then heard from Snedgar that Wilson had a history of shutting off the water to his property, and that Snedgar had not had water since the previous morning. He followed up with Ogden to confirm that the water was running further up the water line, past Wilson's property. He then went with Ogden to inspect the water line and discovered that Snedgar's lack of water was caused by the cut-off valve on Wilson's back porch having been shut off. These facts are sufficient for a prudent man to believe that Wilson had committed the offense.[3] No reasonable jury could return a verdict for plaintiff on this question.

Wilson argues Deputy Fenley had a duty to make a reasonable investigation and therefore could not have probable cause because he "relied solely on Mr. Snedegar's claim that he believed that Mr. Wilson shut off the water." Pl.'s Resp. Defs' Mot. Summ. J. 9, ECF 123. While Deputy Fenley may have had a duty to corroborate Snedgar's statements, he satisfied this duty by performing an investigation that led to such corroboration. Deputy Fenley inspected the

---

[3] Deputy Fenley also prepared an affidavit of probable cause that was reviewed by a State District Court Judge. Def's Mot. Summ. J. Ex. 5, at 5. The judge's finding that the affidavit supported probable cause is persuasive authority supporting this Court's holding in favor of Deputy Fenley.

water line and found circumstantial evidence supporting Snedgar's claims when he saw the cut-off valve on Wilson's property was closed.

Wilson argues that by going on his property, Deputy Fenley conducted a search that violated the fourth amendment and therefore any information obtained from the unlawful search cannot be used to support probable cause. Pl.'s Resp. Defs' Mot. Summ. J. 10. There are several problems with Wilson's theory. First, the search seems in fact to have been lawful via the doctrine of apparent authority. *See United States v. Arreguin*, 735 F.3d 1168, 1175 (9th Cir. 2013) ("Under the apparent authority doctrine, a search is valid if the government proves that the officers who conducted it reasonably believed that the person from whom they obtained consent had the actual authority to grant that consent." (quoting *United States v. Welch*, 4 F.3d 761, 764 (9th Cir. 1993))). Given that Ogden, Snedgar and Wilson all shared one water line with which they had a history of problems, and Ogden was not involved in any disputes with the others, it was reasonable for Deputy Fenley to believe Ogden had authority to enter Wilson's property for the limited purpose of inspecting the water line.

Moreover, even if the search itself was illegal, this Court has recently concluded that "the consensus of the case law is that neither the exclusionary rule nor the fruit of the poisonous [tree] doctrine[s] apply to § 1983 claims." *Lingo v. City of Salem*, 6:12-CV-01019-MC, 2014 WL 1347468, at *9 (D. Or. Apr. 4, 2014). Wilson cites a Sixth Circuit case to support his contrary position, but that case was an appeal of a criminal conviction and is therefore inapposite. Wilson also cites *Ostrover v. City of New York*, 192 A.D.2d 115, 118 (1993). While *Ostrover* may have some limited persuasive value, it does not overcome the overwhelming consensus this court acknowledged in *Lingo*. Additionally, even if the search was illegal, and its illegality precluded its consideration for purposes of probable cause, Deputy Fenley would still have probable cause.

9 – OPINION AND ORDER

Deputy Fenley sufficiently corroborated Snedgar's claims when he confirmed the stalking order with LCSO's police department, and confirmed Ogden still had water pressure. This evidence alone permits reasonable inferences such that a prudent person in Deputy Fenley's position could believe Wilson had committed a crime.

Finally, even if Deputy Fenley did not have probable cause, he would still be protected by qualified immunity. An officer is entitled to qualified immunity unless the constitutional right violated "was clearly established at the time of the incident such that a reasonable officer would have understood [his] conduct to be unlawful in that situation." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011) (citations omitted). The law does not clearly establish that Deputy Fenley's conduct was unlawful and a reasonable officer would not understand it to be unlawful.

### b. Sergeants Weir and Olson.

The probable cause established by Deputy Fenley was sufficient to arrest Wilson. Sergeants Weir and Olson effected the arrest on the basis of this probable cause and therefore did not unlawfully arrest Wilson. The fact that Sergeant Olson obtained Wilson's testimony only after the arrest is irrelevant because the arrest is supported by probable cause even without that testimony. Also, like Deputy Fenley, even if the arrest was not supported by probable cause, Sergeants Weir and Olson would not have understood their conduct to be unlawful when they relied on Deputy Fenley's affidavit of probable cause to make the arrest. Sergeants Weir and Olson would therefore be entitled to qualified immunity.

For all the reasons stated above, summary judgment is GRANTED to all defendants on the unlawful arrest claims.

3. **Excessive Force Claims.**

    a. **Sergeant Weir**

By agreement between the parties, the excessive force claim against Sergeant Weir is DISMISSED.

    b. **Sergeant Olson.**

To determine whether the amount of force used to effect an arrest violates the Fourth Amendment, the critical question is whether the amount of force used was objectively reasonable under the circumstances. *Graham v. Conne*r, 490 U.S. 386, 395 (1989). This determination "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id*. at 396 (citations omitted). The Supreme Court noted relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. Determining whether the amount of force used was reasonable is a fact intensive question that necessarily requires looking at the totality of the circumstances involved. *Id*. (internal citations omitted). Officers are not scrutinized with 20/20 hindsight, but rather given allowance "to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id*. at 396-97.

Based on the differing accounts provided by Sergeant Olson and Wilson, a genuine issue of material fact exists as to whether any force was used to handcuff Wilson and, if so, whether that force was excessive. Drawing all inferences in favor of Wilson a reasonable jury could conclude that Sergeant Olson used unreasonable force to pull Wilson's arms behind his back and put the handcuffs on. Defendants argue that, even based on Wilson's version of events, the

amount of force to take his hands behind his back and handcuff him cannot constitute excessive force because it is "de minimus." Defs' Mem. Supp. Summ. J. 13. The Ninth Circuit has noted that "[w]here there is no need for force, *any* force used is constitutionally unreasonable." *Brooks v. City of Seattle*, 599 F.3d 1018, 1043 (9th Cir. 2010) (emphasis in original) (quoting *Headwaters Forest Def. v. Cnty. Of Humbolt*, 240 F.3d 1185, 1199 (9th Cir. 2000)). Here, particularly considering that the crime was not severe, Wilson posed no immediate threat and was not actively resisting arrest, a reasonable jury could find that no force was required.

Defendants also place great emphasis on Wilson failing to tell anyone of his shoulder condition or injury. Def. Mem. Supp. Summ. J. 12-15. While this may impact Wilson's credibility before a jury, the Court will not assess the credibility of disparate testimony on a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Finally, defendants insist they are entitled to summary judgment because Wilson's version of events is "blatantly contradicted by the record." Defs' Reply Supp. Mot. Summ. J. 8-10. Wilson's testimony is partially contradicted by Sergeant Olson's testimony and report. Drawing all inferences in Wilson's favor, any contradiction is insufficient to entirely discredit Wilson's testimony. Because a genuine issue of material fact exists on this issue, summary judgment for the defendant is DENIED.

### c.  LCSO.

In this case, the LCSO is only liable for the use of excessive force by one of its officers if that "officer's conduct is directly attributable to the city's policy or custom," meaning the LCSO "caused a constitutional violation through official policy or custom." *Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir. 2008) (citing *Monell v. Dep't of Soc. Servs. Of New York*, 436 U.S. 658, 691-694 (1978)).

12 – OPINION AND ORDER

If Olson used excessive force when arresting Wilson, it was not caused by the LCSO's official policy or custom. Nowhere in the LCSO's policy on "Use of Force" does it direct officers to use more than reasonable or justified force and it only directs officers to use force when dealing with a person resisting arrest. *See* Defs' Mot. Summ. J. Ex. 9, at 2-3. Furthermore, it expressly refers deputies to the factors articulated by the Supreme Court in *Graham* to determine the amount of force that is reasonable in a given situation. *Id.* at 3. The LCSO's custom, as described by Chief Deputy Byron Trapp, typically requires an arrestee to have his hands cuffed behind his back, but allows for reasonable accommodations based on disability and age. Defs' Mot. Summ. J. Ex. 10. A use of excessive force cannot be attributed to the LCSO's policy or custom, because it directs officers to consider the constitutionally relevant factors when determining how much force is reasonable and allows accommodation based on an arrestee's needs. Accordingly, summary judgment is GRANTED to the LCSO on the claim of excessive force.

### 4. Indifference to Medical Needs Claims.

A claim of indifference to medical needs under the due process clause of the Fourteenth Amendment is evaluated under the traditional Eighth Amendment standard used for convicted inmates. *Lolli v. Cnty. of Orange*, 351 F.3d 410, 418-19 (9th Cir. 2003). This standard is violated when a prison official shows "deliberate indifference to a prisoner's serious illness or injury." *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105 (1976)). There are two prongs to a deliberate indifference claim. The first is an objective standard, which Wilson must satisfy by showing that the "failure to treat [his] condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Clement*, 298 F.3d at 904 (citations omitted).

The second prong is a subjective standard which is satisfied only by showing that "the official knows of and disregards an excessive risk to [the] inmate['s] health or safety." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Mere negligence is not enough. *Id.* (citing *Frost v. Agnos*, 152 F.3d at 1124, 1128 (9th Cir. 1998)). Rather, "the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Farmer,* 511 U.S. at 837).

### a.  Objective Serious Medical Need.

A reasonable jury could find that Wilson had an objective serious medical need. Viewed in the light most favorable to plaintiff, Wilson told medical staff about several medical conditions, including his shoulder pain. He also told medical staff he was on more than one medication and requested pain medication for his shoulder and knee pain. He needed to put his dislocated shoulder back in place, on his own, sometime during the evening that he was being held. The pain caused by his shoulder was unbearable, and he eventually made a sling for his arm. Wilson Aff. 12. Medical evidence confirms that Wilson has a degenerative condition in his shoulder. This evidence, in combination, would be sufficient for a reasonable jury to conclude that a failure to provide Wilson with appropriate medical attention inflicted an unnecessary and wanton degree of pain on him.

### b.  Subjective Deliberate Indifference.

The uncontested record in this case establishes that prison medical staff examined Wilson when he was first booked, and on at least four more occasions. *See* Tran-Caffee Dec. Ex. 14; Def. Mot. Summ. J. Ex. 25. He was placed on a continuous medical observation while being held which meant a corrections deputy checked in on him every thirty minutes. Campbell Dec. ¶¶ 4-14; Tran-Caffee Dec. Ex. 7. Deputy Kreiger was aware that Wilson had already been seen by

14 – OPINION AND ORDER

medical personnel, and all the evidence indicates that she subjectively believed Wilson was not suffering from any serious medical conditions while she was observing him. *See* Tran-Caffee Dec. Ex. 7; Campbell Dec. ¶¶ 9-13.

Deputy Kreiger was not deliberately indifferent to Wilson's medical needs. There is no evidence that would allow a reasonable jury to conclude that she subjectively drew the inference that Wilson suffered a substantial risk of serious harm. All the evidence in the record indicates precisely the opposite: Deputy Kreiger was aware medical staff had already seen Wilson and based on her observations she did not believe he should even be under medical observation. As noted, the mere negligence of Deputy Kreiger is not enough for Wilson to prevail on his deliberate indifference claim. *Clement*, 298 F.3d at 904 (citations omitted). Deputy Kreiger could not provide any medical care and possesses only basic medical training. Campbell Dec. ¶ 3. Additionally, Deputy Kreiger knew LCSO medical staff previously examined Wilson. No reasonable jury could find Deputy Kreiger had a subjective belief that Wilson was at risk of serious harm.

The LCSO also cannot be held liable for deliberate indifference to Wilson's medical needs. As noted *supra*, for the LCSO to be liable for a § 1983 claim its policy or custom must have caused the constitutional violation. Here, there is no evidence of LCSO's policy provided by either party. Under the LCSO's normal practices, however, Wilson was seen by medical personnel regularly from the time he was first booked until his release, and placed on a medical observation that had correctional staff check on him every thirty minutes. This practice more than adequately provides for Wilson's medical needs and no reasonable jury could find that it caused prison staff to be deliberately indifferent.

Accordingly, summary judgment is GRANTED on the claims of deliberate indifference to medical needs against Kreiger and the LCSO.

**5. Access to a Telephone Claims.**

The due process clause of the Fourteenth Amendment requires that any detainee be given "the opportunity to communicate with someone outside the institution where he is held, at a time and in a manner consistent with practical management of booking and confinement procedures and institutional security and order." *Halvorsen v. Baird*, 146 F.3d 680, 689 (9th Cir. 1998). To determine whether this right has been infringed "[t]he duration of incommunicado confinement has to be considered against the reasons why communication might be necessary, and why it might be impractical." *Id.* at 690.

Defendants note that according to the record Wilson was housed in "Bookin 2," which had a phone, for at least 23 minutes after he was first brought in. Defs' Mot. Summ. J. Ex. 26; Brown Dec. ¶¶ 6-7. They argue summary judgment is therefore appropriate because Wilson was not denied access to a telephone. Defs' Mem Supp. Summ. J. 17-18. However, the evidence also indicates that Wilson collapsed on the floor within thirty seconds of being brought into "Bookin 2." Tran-Caffee Dec. Ex. 7, 14. Viewed in the light most favorable to the plaintiff, a reasonable jury could concluded that Wilson did not have an opportunity to use the phone during this time because he was incapacitated. Summary judgment is therefore not appropriate on the basis that Wilson had access to a phone.

**a. Deputy Kreiger.**

Deputy Kreiger argues that practical security concerns required her to hold Wilson incommunicado while she was on shift. *See* Defs' Mem. Supp. Summ. J. 18-20. Deputy Kreiger testified that Wilson was "screaming and yelling and pounding on the door and causing quite a

16 – OPINION AND ORDER

ruckus," which made him "unpredictable and a security concern." Def. Mot. Summ. J. Ex. 30, 31. Wilson claims he calmly requested to use the telephone by passing notes and knocking on his door. Pl's Resp. Defs' Mot. Summ. J. 20; Wilson Aff. 4. This contradictory testimony presents a genuine issue of material fact. Moreover, by the end of Kreiger's shift Wilson had been held incommunicado for around 10 hours. Wilson needed to communicate with someone about obtaining his daily medications. Given the disparate testimony, this Court cannot hold as a matter of law that the impracticalities of giving Wilson access to a phone outweighed the reason he needed to communicate along with the length of time he had already been held incommunicado.

### b. LCSO.

As the Court explained *supra*, LCSO can be liable for a § 1983 claim if it caused the constitutional violation through its policies or customs. Chief Deputy Byron Trapp explained that telephone use is construed as a privilege in LCSO's official policy. Tran-Caffee Dec. Ex. 15. More importantly, Deputy Kreiger's deposition testimony indicates that she was unable to give Wilson access to a phone during the time she was on shift because she couldn't afford the time away from her other duties and she had no other personnel available, nor any cameras, to ensure her own safety. Def. Mot. Summ. J. Ex. 29-32. Viewed in a light most favorable to the plaintiff, the LCSO's policy and custom could have caused Wilson to be deprived of his constitutional rights by not giving Kreiger adequate resources to allow Wilson access to the phone.

For the foregoing reasons, summary judgment is DENIED to Kreiger and to the LCSO on the claim for lack of access to a telephone.

## CONCLUSION

Defendants' motion for summary judgment (ECF No. 120) is DENIED in part and GRANTED in part. The remaining claims are the excessive force claim against Sergeant Olson

17 – OPINION AND ORDER

and the access to a telephone claims against the LCSO and Deputy Kreiger. All other claims are dismissed.

IT IS SO ORDERED.

DATED this 24th day of October, 2014.


_____/s/ Michael J. McShane_____
Michael McShane
United States District Judge

18 – OPINION AND ORDER